No. 70.—The Macon & Western R. R. Co. plaintiffs in error, *vs.* William B. Parker, defendant.

[1.] Is a railroad subject to levy and sale, at Law? *Query.*

[2.] For the purpose of marshaling the assets of an insolvent estate, the executor or administrator may file his bill and obtain a decree, not only for the purpose of reducing the property to money, but, also, of ascertaining the order in which the debts are to be paid.

[3.] A Court of Equity does not, as of course, assume jurisdiction in taking executions upon judgments *at Law* into its own hands, as such power would be oppressive both to the debtor and the Court.

[4.] The presumption is, that the Court which renders a judgment is competent to enforce it, and it is only in special cases that Chancery interferes.

[5.] Where there are sundry *fi. fas.* against an insolvent railroad company, threatening to seize and sell the road, with its equipments, extending one hundred miles in length through six different Counties, Equity will take jurisdiction of the matter, direct a sale of the entire property for the benefit of all concerned, and distribute the fund according to the practice and usage in Chancery, in a creditor's suit against executors and administrators. In such a case, no other Court but that of Chancery possesses adequate jurisdiction to reach and dispose of the entire merits.

[6.] To allow the road to be cut up into fragments, and separate portions sold at different sales, in the different Counties through which it passes, to different purchasers, would not only sacrifice the rights and interests of creditors, but defeat the objects and intentions of the Legistature in granting the charter.

[7.] The powers of Equity will be invoked to aid the defects of the Law ; and where the facts and circumstances of the case are novel and peculiar, analogous principles will be applied to the existing emergency.

[8.] Any creditor who has a claim upon the fund, but who is not a nominal party to the suit, may make himself a party thereto in fact, by coming in and presenting his claim under the decree, and submitting himself to the jurisdiction of the Court for its settlement and adjustment upon the fund to be distributed.

[9.] If he neglects or refuses to come in and entitle himself to the benefit of the decree, Equity will not assist him to set aside and annul.

In Equity, from Bibb. Decision on demurrer, by Judge STARK, at July Term, 1850.

This bill was filed for foreclosure, account and relief, by Wm. B. Parker *vs.* the Macon and Western R. R. Co. (R. Collins, J. D. Gray, D. McDougald and E. Alexander being made also parties defendants.) It seeks to foreclose certain bonds or certificates of indebtedness to amount of $47,500, principal, predicated on and connected, by reference, to a certain mortgage contract dated 2d August, 1842, between the Monroe R. R. & Banking Company, (whose charter, amended, is the same used by the Macon & W. R. R. Co.) of the one part, and John D. Gray and others, to wit: R. Collins, D. McDougald, E. Alexander and A. B. Davis, (the latter deceased and not represented,) of the other part.

This 2d August contract mortgages the entire road and appur-

tenances, connected or to be connected, to said contractors, to secure payment for the work to be done, and materials supplied for said company, but especially for building and completing that part above Griffin. By said 2d August contract three-fourths of the net receipts of the entire road were also mortgaged and pledged for the like purpose.

The work was carried on, and from time to time the company's engineer certified to different sections of it, and the company accepted and ratified said portions, as per contract, and issued its *bonds* or *certificates* therefor, in divided amounts for convenience, of which the following is an exact sample of those held by Parker, to wit:

| |
|---|
| $1,000.          *Secured by Mortgage.* |
| This is to certify, that the Monroe R. R. & Banking Co. acknowledge to owe to John D. Gray, or bearer, one thousand dollars, for work and materials on the road; 20 per cent of which, with interest from date, shall be payable on the 1st day of October, 1844, and 20 per cent. on 1st day of October each and every year thereafter, until the *whole is paid;* and to secure these payments, the above road and appurtenances are specially mortgaged, as per contract, dated 2d August, 1842, duly executed and recorded: *Provided,* that the failure to pay any one of these instalments at maturity, shall not render the succeeding ones demandable before they respectively fall due, as above expressed. |
| Macon, Ga. July 1, 1844.    A. COCHRAN, Pres't. |
| M. L. GRAYBILL, |
| $1,000.                    Cashier. |

*Three-fourths the net receipts of the Road is specially appropriated to the payment of these Bonds.*

The 2d August contract, while it vested in the said contractors the road and appurtenances, in full title and estate, until all the *dues* and payments to which they should become entitled, under said contract, shall have been fully met and satisfied, also provided, that they should not " *coerce* payment *any further* than 75 per cent. of the net receipts of the road, until their contract should be fully completed and performed.

Parker's bill and exhibits show the foregoing facts, and then, in the "charging" part, refer to various pretences of defendant, (below,) and among other things, to a certain pretended decree under which defendant claims; and in avoidance of said supposed defences, the bill alleges, that the old Monroe R. R. & Bank'g Co. being greatly embarrassed and pressed by certain of its judgment creditors, filed a bill seeking to enjoin them in behalf of the public nature of the work, but chiefly in behalf of the said contractors, Gray and others; that said bill was amended, and the prayer and the relief sought were, at the trial term in May, 1845, so changed as to ask for or suggest to the Court the plan of *selling the road,* and praying, in such event, a distribution of the proceeds among *all* its creditors of all descriptions.

At May Term, 1845, a decree was obtained, which directed a sale, by five commissioners, to be made on the first Tuesday in August, 1845, and directing advertisement for all creditors of every description, naming mortgagees, to file their claims with the Clerk of the Court, and that creditors then litigate their claims among themselves. This sale came off on 5th August, 1845, and, after some disconnected property bought by others, the *road* and all its appurtenances was bid off by one Jerry Cowles, acting as agent for one Daniel Tyler; that Tyler, in January, 1846, paid over about $155,000, and the five commissioners gave him a deed; that Tyler deeded the same to the defendant, the Macon & Western R. R. Company—being, in truth and fact, only the agent for the persons who soon thereafter became said company.

The bill charges fraud, irregularity and want of and excess of jurisdiction, in procuring the decree of May, 1845, and notice of the whole by Tyler, through his agent, Jerry Cowles. It also charges, that Tyler, before he paid the purchase money, had notice of said irregularities, and of Parker's *lien,* and that defendant, (the company,) by Tyler, its first President, also before it paid its money, had notice of the aforesaid irregularities, and of Parker's claims and their character; that Parker was not a party to said old bill, though he went before the Court and *protested* when a motion was made to confirm and ratify the com-

missioners' report, and protested against it and all the proceedings so far as they might affect his mortgage liens; that after the money was paid by Tyler, and under the advertisement for all creditors to come in and prove their debts, various creditors did do so, but he declined and refused to go in and claim the same, or any part thereof; that on the day of sale, and at the sale in August, 1845, he was present and proclaimed aloud, so that J. Cowles and all present heard him, that he held these particular mortgages; that by reason of this notice, and notices of other liens, the road sold for much less than it otherwise would have brought.

The fraud and irregularities as specified, in part, are, that complainant's solicitor in said old bill, after the Jury were charged with the case, went into the jury room and conversed with them about their pending inquiry; that Tyler was really agent for persons at the North, who afterwards came forward as stockholders in the company, (defendants,) and it was their money and not his, that he paid for the road, and that he took the deed in his name in fraud, to have the apparent shield for the company of purchasing without notice, when they got title from him.

The bill admits that the contractors did not fully finish the road, but urges the failures of the old company as dispensing with this as a precedent duty to foreclosing on the road, and also sets up their practical waiver. It states that, as to a part of the road, Parker's are the highest liens, and that this Court has so decided. It prays, that any other certificate holders, if any, when discovered, may be made parties.

The bill then prays a foreclosure for his whole debt, either,

1st. On the entire road and its receipts; or,

2d. On that part which was built by Gray and others, under the mortgage of 2d August, 1842, and its net receipts; or,

3d. Upon the net receipts alone of the part so built: i. e. from Griffin to Atlanta.

To this bill there was a general demurrer filed by the defendant.

At the hearing, July Term, 1850, of Bibb Superior Court,

Judge *Stark* overruled the demurrer, and counsel for defendant excepted.

CHAPPELL and McDONALD, for plaintiffs in error.

S. T. BAILEY, RUTHERFORD and COLE, for defendant in error.

Brief of C. J. McDONALD, for plaintiff in error.

1st. On the sale of property under the highest lien, the purchaser takes a perfect title. He cannot be disturbed by inferior liens. *Georgia Decisions, part* 2, *p.* 50. 2 *Kinne,* 201.

2d. The bill contains no facts and data on which the Court can base a decree.

3d. The mortgage is a joint one, and all the parties thereto and all who have the right to claim as mortgagees, are necessary parties to the suit. *Story's Com. on Eq. Plead.* §199, 169.

4th. There was a condition precedent in the contract, and the bill does not show its performance.

5th. The supplement to the contract is not signed by both parties, and, therefore, binds neither.

6th. By the terms of the decree, the purchaser is protected. He was to take the property discharged of all liens and incumbrances, and the bill shows that the proceeds of sale were applied to liens which overrode his. In such case he was not a necessary party. *Sto. Eq. Pl.* §639. 2 *Kinne,* 201.

7th. The bill impeaches the decree under which the sale was made, and in such case it is necessary that the proceedings of that cause should be set out fully and at large. *Sto. Eq. Pl.* §428. *Gifford vs. Hart,* 1 *Sch. & Lefroy,* 386. *Kennedy vs. Daly,* 1 *Sch. & Le.* 355, 374, 375.

8th. The sale was under a decree of a Court of Chancery, which provided for complainant's coming in and claiming. He might have come in. He had notice of the decree and all its provisions, and if he refused to come in, the Court will not now lend its aid, to the injury of the purchaser. *Paxton vs. Douglas,* 383. 1 *Brown's Ch. Rep.* 171. 1 *Vesey, Jr.* 256, *note* 7. 10

*Paige's Rep.* 383. 4 *Johns. Ch. Rep.* 643. 9 *Paige,* 260, 600. 1 *Sug. on Vend.* 103, §16. 12 *Eng. Com. L. Rep.* 585. 18 *Ves.* 469.

9th. Irregularity in the proceedings will not affect the purchaser. 1 *Paige's Rep.* 95, 96. 12 *Ves.* 106, *also note* 4.

10th. The reversal of a decree will not affect the title of the purchaser. 12 *Ves. Jr.* 89, *note.* 1 *Ball & Beattie's Rep.* 232.

11th. A *bona fide* purchaser under a decree fraudulently made, to whom no collusion can be brought home, will be protected. 1 *Vesey,* 567.

12th. Provisional sale may be made, and if found to be unnecessary, the purchaser will be protected. 9 *Ves.* 67, *note* 3.

13th. The allegation that complainant was not a party to the bill on which the decree of sale was made, is not an allegation amounting to a fraud. *Sto. Eq. Pl.* §117. 3 *Swanston,* 284. 16 *Ves.* 328, 329. 3 *Mason, Wood vs. Dummer.*

14th. No equity in the bill—

1. The company had no power to mortgage the road, and mortgage therefore void. 3 *Rob. Lou. Rep.* 5-7.

2. The contract claimed to be a mortgage, contains no provision for securing any such certificate as that held by complainant and sued on.

3. Complainant does not show at what time he became the owner of the certificate. If he purchased, *pendente lite,* he need not have been made a party. *Calvert on Eq.* 128. 3 *Swans. R.* 144. *Story's Eq. Pl.* 179, §194. 2 *Atkyns,* 174.

The bill does not show the consideration paid by complainant for the certificates and bonds held by him, and as against a real purchaser he cannot claim more than he paid. 1 *Vernon,* 476. *Ib.* 464. 15 *Mass. R.* 505. *Ang. & Ames on Cor.* 475.

Practice of opening bidding not recognized in this country. *Daniel's Ch. Pr.* 1465.

Brief of S. T. BAILEY, for defendant in error.

When a suit is commenced against five, and the writ is served only on three, and the plaintiff takes judgment against all five,

that judgment is a lien only against those who were served. *Purdy vs. Doyle*, 1 *Paige*, 555.

In Chancery, whenever land is pledged to secure the payment of money, the conveyance is a mortgage, whatever form the conveyance takes. *Kellerand vs. Brown*, 4 *Mass.* 443.

When a vendee records and speaks of a conveyance as a mortgage, it is a circumstance to prove it a mortgage or security for money. *Oldham vs. Halley*, 2 *J. J. Marshall*, 115.

Every contract for the security of a debt, by the conveyance of real estate, is a mortgage. *Henry vs. Davis*, 7 *J. C. R.* 40.

A mortgage to secure future advances is valid and binding. *James vs. Morey*, 2 *Cow.* 247.

A mortgage is only a security for a debt, and anything which transfers or extinguishes the debt, transfers or discharges the mortgage, as an incident of the debt. *Barnes vs. Lee*, 1 *Bibb*, 526.

It is not necessary to the validity of a mortgage, that it states truly the debt intended to be secured; but it shall stand as a security for the real equitable claims of the mortgagee, whether they existed at the date of the mortgage, or arose afterwards upon the faith of the mortgage, before notice of defendant's equity. *Shiras vs. Carey*, 7 *Cranch*, 35. 2 *Con. R. U. S.* 408.

When a purchaser has notice of a mortgage before he takes a deed or pays the purchase money, he is bound by the prior lien, and is not a *bona fide* purchaser. *Beekman vs. Frost*, 18 *J. R.* 544.

If a mortgage is registered, it is notice to all subsequent purchasers and mortgagees, and there must be proof of intentional fraud to postpone or bar the mortgage. *Brinkerhoff vs. Lansing*, 4 *J. C. R.* 70.

On a bill for foreclosure by the assignee of a mortgage, it is not necessary to make the mortgagee a party—he having parted with all his interest by an absolute assignment. *Whitney vs. McKinnie*, 7 *J. C. R.* 144.

A second mortgagee may file a bill to foreclose without making the first mortgagee a party. *Rose vs. Page*, 2 *Sim.* 471.

An assignment of the mortgaged debt, without conveyance of

Macon & Western R. R. Co. *vs.* Parker.

the legal title of the mortgaged premises, is sufficient to author-ize the assignee to foreclose.  *Austin vs. Burbank*, 2 *Day*, 474.

A mortgagee, although he has conveyed in fee the whole mortgaged premises, can yet foreclose; for his conveyance of the land does not pass his interest in the mortgage.  *Wilson vs. Troup*, 2 *Cowen*, 195.

One of the mortgagees, to secure a joint debt, having assign-ed all his interest in the mortgaged premises, and the other having been paid his share, the assignee may file a bill by himself and in his own name to foreclose.  *King vs. Harrington*, 2 *Atk*. 33.  2 *V. B. H. Dig*. 292.

Incumbrances not made parties are not affected by a decree, and purchasers take subject to such incumbrances.  *Finley vs. Bank U. S.* 6 *Cow. R. U. S*. 319.

A purchaser under a sale by virtue of a decree of foreclosure, will only take title as against the parties to the suit, and he can-not set it up against those incumbrances and equities who are not parties to the suit.  *Hayne vs. Beach*, 3 *J. C. R*. 459.

A second mortgagee may file a bill to foreclose, notwithstand-ing a prior sale under a decree, and the purchaser, either at pri-vate or public sale, is not protected against such incumbrances, if he had either constructive or actual notice of it, and the subse-quent incumbrancer were not a party to the prior suit or decree, and he need not offer to pay or redeem the prior incumbrances, but is entitled to a sale of the premises.  *Vanderkamp vs. Shel-ton*, 11 *Paige's R*. 28.

A decree against an executor, *in invitum*, unless impeached for fraud, binds the residuary legatees; but when it is by consent, it is subject to re-examination, and has no obligation unless prov-ed to be just.  *Land vs. Gatlin*, 2 *Dev. & Bat. Eq.* 37.

A judgment or decree binds nor protects none but those who are parties or privies to it.  *Marrigault vs. Harrison*, 1 *Brock*. 126.

The purchaser at public sale of premises incumbered by a mortgage, purchases nothing but the equity of redemption, sub-ject to the mortgage.  *Hartshorn vs. Hartshorn*, 1 *Green. Ch. R*. 349.

A forfeiture cannot be taken advantage of, nor enforced against a corporation, collaterally, nor in any mode or manner, but by a direct proceeding by and in the name of the Government. *Angell & Ames on Corp.* 664.

When a decree in Equity directed lands to be sold for the benefit of creditors, and it was sold by the Sheriff under such decree, and the sale ratified by the Court of Chancery, held, that the purchaser took only the interest of such as were parties to the bill on which the decree was founded, and that the rights of others, not parties, although intended to be bound, were in no way affected by the decree and sale. *Laurens vs. Jenney,* 1 *Speer,* 356.

A person is not to be in any measure affected by a decision between others, merely because he was present at the trial and cross-examined witnesses; he must, like a party, have had a full, fair and previous opportunity to meet the question in controversy. *Turpin vs. Thomas,* 2 *Hening & Munford,* 139, 147. *Wood vs. Jackson,* 8 *Wend.* 26, 27.

One affected by a decree, but not a party, may aver and prove it was entered by an agreement of the parties, though it contradict the record. *Stark's Adm'rs vs. Thomson's Exr's,* 3 *Monroe's R.* 302.

Brief of J. RUTHERFORD, for defendant in error—

1*st. Point.* One of fact—that the first ground of error is a mistake of the facts in the bill.

2*d. Point.* We join issue on second ground of error as to bill not containing sufficient data, &c.

3*d. Point.* On third ground of error, for want of proper parties, we say, ours is such a mortgage as Parker alone can proceed in, having a separate interest in joint contract. *Broom on Par.* 8. 8 *Taunt.* 248. 2 *Story's Eq.* §1018. 1 *Kelly,* 435.

4*th. Point.* As mortgagee, and prior one, the Court will dispense with the rule of making all in interest parties—especially as they all cannot, in the nature of the case, be known. 3 *J. Ch. R.* 459. *Story's Eq. Pl.* §135, *a.* 96, 97, 92. *Mit. Pl.* 180.

*Calv. Part.* 128, 138.   *Story's Eq. Pl.* §193, (*midway*,) *and n.* 1, *end of sec.*   3 *Ves.* 317.

*5th Point.* This (third) ground is not good, because it does not point out and show who complainant has left out as parties. *Story's Eq. Pl.* §543, 238.   *Mit. Eq.* 180, '81.   1 *Smith's Ch. Pr.* 203.   1 *Myl. & K.* 17,   1 *Dan. Ch. Pr.* 385.        -

*6th Point*, (*4th error.*)  We take issue as to the fact.   Then see *Batton's Eq. Con.* 87, 126.   2 *Pet.* 102.   14 *Mass.* 266.

*7th Point* (*under 6th ground.*)   See *Story's Eq. Pl.* §676, §450, 33, *n.* 1, §46.   The way we charge fraud will do.   *Story's Eq. Pl.* §28, 251, 252.

But this is a demurrer and admits the full fact, and as stated. 2 *Dan. Ch. Pr.* 20, 12.   By plea is the way to notice it.   2 *Ib.* 99, 100.

*8th Point* (*under 6th ground.*)   We do not pray to set aside said decree—not necessary to do that.

*9th Point* (*under 8th ground.*)   We join issue of fact, and say fraud is charged, and facts given to prove it.   Then see 2 *Tidd*, 867.   *Cro. Eliz.* 189, 411.   1 *Root*, 134.   3 *Day*, 219.

*10th Point.* Our bill specifies fraud and usurpation and excess of jurisdiction.   To which see 15 *J. R.* 141.   19 *Ib.* 33.   10 *Pet. Rep.* 449.   *Story's Eq. Pl.* 7.   8 *Cranch*, 9, 22.

*11th Point* (*under 9th, 7th and 5th grounds.*)  First, as a creditor's bill, we say Parker was not bound to go in and claim under the decree of May, 1845.   The bill says he did not.   Then see 2 *Ball. & Beat.* 354, 357.   *Welf. Eq. Pl.* 54.   3 *Myl. & C.* 69, 70.   1 *Dan. Ch. Pr.* 376.   2 *Sim.* 471.   8 *Price*, 518.   2 *Ball. & Beat.* 567, *n.*   *Story's Eq. Pl.* §274, *a. p.* 227.   *Cow. on Mort.* 379.   2 *Dick.* 707.   *Tidd.* 853.

Not obligatory for even simple contract creditors to go in, and prior incumbrancers are excluded.   1 *Story's Eq.* §548.   1 *Crai. & Phil.* 48, 56.   2 *Danl. Ch. Pr.* 802, 469.   2 *Smith's Ch. Pr.* 102.   Effect of not going in.   2 *Danl. Ch. Pr.* 856, 500.

The old bill treated as an assignment by insolvent.   Parker not bound to go in.   1 *Dick.* 376.   1 *Coxe's R.* 422.   2 *Ib.* 378.   1 *Swanston*, 579.   *Jeremy's Eq.* 250.   2 *Story's Eq.* §829, *o.* 1038.   2 *Dick.* 608.   19 *Ves.* 153.   2 *Smith's Ch. Pr.* 102.

Macon & Western R. R. Co. *vs.* Parker.

The assignee himself takes, subject to all equities of the insolvent. 1 *Bro. C. C.* 302. *Amb.* 724.

*12th Point.* Defendant (in bill) not a *bona fide* purchaser, and not entitled to protection. 1 *Dan. Ch. Pr.* 533, 911. 1 *Bli.* 169. 1 *Sch. & Lef.* 386. 2 *Ib.* 566. 3 *Mer.* 310. 14 *Ves.* 550. 6 *Beav.* 97, (two latter to point that Chancery does not warrant.) To same, 2 *Smith Ch. Pr.* 285. 2 *Sch. & Lef.* 603.

Purchaser or his vendee gets only title of defendant in the case. 6 *Dana,* 402. 1 *Green's Ch.* 348, 349.

Covenant to pay annual rents runs with the land. 3 *Wils.* 25. 2 *Story's Eq.* §1231. 4 *Ves.* 478. 4 *Bro. Ch. C.* 421. An annuity charge runs with the land. *Sug. Ven.* 372. 2 *Tuck. Com.* 452.

Defendants bound by Tyler's engagements before they bought. *Barton on Con.* 121, 198, 36. 16. 1 *Myl. & C.* 370. 3 *Ib.* 97. See 11 *Gill. & John.* 1. 4 *Kent,* 470, n. f. 2 *Ball & Beatt.* 354. 2 *Smith's Ch. Pr.* 211.

Master's report—what? 2 *Smith's Ch. Pr.* 185, 187. *Bennett's Pr. on Mas. Off.* 106, 168, '69, 89, 138. 2 *Ib.* 161, 211. As to purchaser not being satisfied. 2 *Ball. & Beat.* 354.

*13th Point.* If Parker had been a regular party, he could now object to decree for want of or excess of jurisdiction. 4 *Cowen,* 292. 9 *Ib.* 227. 1 *Ves.* 441. 2 *Kent,* 312, '13. *A. & A.* 665. And if he had gone in for the money after consenting to the sale, he, on objection, would have been rejected. 1 *Danl. Ch. Pr.* 376. 3 *Swanst.* 144, n.

*14th Point.* The Macon & Western Railroad and the old Monroe Railroad the same person, and cannot object to foreclosure.

*By the Court.*—LUMPKIN, J. delivering the opinion.

In 1833, the Legislature granted a charter to the Monroe Railroad Company, to construct a railroad from Macon to Forsyth. In 1835, an Act was passed amending and reviving the Act of 1833, and in 1836, another Act was passed, amending and extending the provisions of the original charter. This last Act provides, that the company may increase their stock so as to ex-

tend their road in a northwestern direction, and also confers banking privileges.

On the 2d of August, 1842, said company being greatly embarrassed and unable to proceed with their work, which was in a very imperfect and ruinous condition, even below Forsyth, entered into a contract with Robert Collins, Elam Alexander, John D. Gray & Co. Daniel McDougald and Arthur B. Davis, to build and equip the said road from and between Griffin and Atlanta; and, among other things, it was stipulated, that the entire railroad with all its appurtenances, should be vested in the said contractors, until all the dues and payments to which they should be entitled under said contract should be fully met and satisfied.

In 1844, the Roswell Manufacturing Company and other creditors, having obtained judgments against the Monroe Railroad and Banking Company, sought to subject said road to levy and sale, at law, by virtue of their executions.

[1.] Whether a railroad is subject to levy and sale at law, is seriously doubted. In Pennsylvania it has been decided, that a *turnpike* was not the subject of sale. *Henmout vs. The Pittsburg Turnpike Company*, 13 *Serg. & Rawle*, 210. In North Carolina, on the contrary, it has been held that a railroad company has an estate in the land, and not a mere easement, and that the estate is subject to sale under execution. *State vs. Rives*, 5 *Ired. Law Rep.* 307. We do not decide this question.

To resume the narrative : the company obtained an injunction and arrested the Common Law *fi: fas.* and at May Term, 1845, of the Superior Court of Bibb County, obtained a decree for the sale of the road and equipments, together with all the rights, franchises and property therewith connected, and for a distribution of the proceeds among all the creditors, according to the priority of their claims—the said company having become entirely insolvent and unable to complete the road, or keep the same in operation, or to pay their debts.

The decree further found, that there were various descriptions of creditors, viz : holders of the bank-notes issued by the company; holders of bonds issued for work and materials for said road; judgment creditors; creditors holding certificates of de-

posit; demands for work, labor and materials for said railroad, and creditors claiming to be mortgage creditors of said company, and others not specifically enumerated; and that among them were creditors who claimed a priority of right in respect to their claims.

David C. Campbell, Abner P. Powers, James A. Nisbet, Samuel B. Hunter and Thomas Hardeman, were appointed commissioners to sell the road, on the first Tuesday in August, 1845, after giving two months' notice in the public gazettes of Macon, Griffin and Savannah, and the proceeds were directed to be paid into Court—public notice was to be given to the creditors of the company to file their claims or a schedule of them with the Clerk, by the first Monday in October next ensuing the sale; and in the event of any controversy, the creditors were authorized and directed to litigate among themselves, and their several and respective liens were to be investigated and adjudicated.

It was further decreed, that the purchasers of the road should succeed to all the obligations of the company in regard to the completing, equipping and keeping the road in operation, as intended and designed by the Act of incorporation, but not to extend to any liability for debts contracted prior to the sale; and, *finally*, William B. Parker, the complainant in the bill, was appointed *trustee* in charge of the road, with its appurtenances, until the sale should be consummated; and it was made his duty to make monthly returns of the receipts and expenditures, and file the same with the Clerk of the Court, subject to the examination and approval of the Court.

In pursuance of this decree, the road was sold at the time and place designated, and bid off by Jerry Cowles, acting as the agent of Daniel Tyler, at and for the sum of $155,000, and a deed was executed by the commissioners. The whole amount brought into Court for distribution, including the price of some disconnected property, was $160,525 33.

To settle the difficulty as to the sale of a franchise, without the consent of the power which granted it, upon application to the Legislature, an Act was passed in 1847, creating Daniel Tyler, the purchaser, and his associates, a body politic and corpo-

rate, by the name and style of the Macon & Western Railroad Company, and conferring on them all the powers, privileges and immunities of the old company, with the exception of banking. *Pamphlet Laws of* 1847, *p.* 181.

At the May Term, 1846, of the Superior Court of Bibb County, the question of the distribution of the fund arising from the sale of the road with its appendages, among the creditors, came up, when it was insisted, on the part of the Central Bank and others, *bill-holders* of the company, that the money in hand should be first applied in satisfaction of the *bills*, by virtue of the statutory lien, created by the 11th section of the charter. On the other hand, counsel for Robert Collins, one of the joint contractors under the agreement of 2d August, 1842, contended that he, as the holder of bonds and certificates, secured by mortgage on said road for work, labor and materials done and furnished subsequent to the execution of said mortgage, and on the faith thereof, was entitled to priority of payment out of said fund.

The presiding Judge ruled, that the lien of the *bills* of the company, under the 11th section of their charter, was paramount to and over-rode all others, and directed the money to be paid out accordingly. To this decision counsel for Collins excepted.

At August Term, 1846, at Decatur, this cause came up, on writ of error, to be heard before this Court, when it was adjudged, that the *bill-holders* had a paramount lien *only* on the fund raised from the sale of the railroad from Macon to Griffin, and so much of the road from Griffin to Atlanta as was built by the company prior to the contract of August, 1842, and that the contractors under the agreement of that date, had a prior and superior equity, to be paid out of said fund, in proportion to the relative value of the work done by them on said road, and materials and equipments furnished between Griffin and the upper terminus in DeKalb, and the Court below was instructed to appoint three commissioners to apportion the proceeds of the sale accordingly. So much for the previous history of this case.

William B. Parker, the individual designated as *trustee* under the decree for the purposes therein stated, now files his bill in

Bibb Superior Court, alleging that he is the holder, by transfer from John D. Gray, one of the original joint contractors, of bonds and certificates of indebtedness, arising under the agreement of 2d August, 1842, to the amount of $47,500, principal. The bill charges fraud, irregularity, and want and excess of jurisdiction, in procuring the decree of May, 1845, and notice of the whole by Tyler, through his agent, Jerry Cowles. It also charges that Tyler, before he paid the purchase money, had notice of said irregularities, and of complainant's lien; and that the present company, by Tyler, its first president, also before it paid its money, had notice of the aforesaid irregularities, and of Parker's claims, and of their character, and that Parker was not a party to the first bill, *though he went before the Court and protested against it, when a motion was made to confirm and ratify the commissioners' report, and objected to the entire proceeding so far as it might prejudice his mortgage rights*; that after the money was paid by Tyler, and under the advertisement for all creditors to come in and prove their debts, various creditors did so, *but that he declined to participate;* that on the day of sale he was present, and proclaimed aloud, so that Jerry Cowles and all present heard him, that he held these liens, which he is now seeking to enforce, *and that on this account the road sold for much less than it otherwise would have brought.*

The specification of fraud and irregularity charged in the bill is this: That after the Jury had retired, the solicitor of the company went into their room, and counseled with the Jury concerning their finding; that Tyler was really agent for persons at the north—residing in New York and Massachusetts—who afterwards came forward as stockholders, and that it was their money, and not his, that paid for the road; and that he took the deed in his name in fraud, to have the apparent shield of the company of being *bona fide* purchasers.

The bill admits, that the contractors did not finish and furnish the road, nor does it aver any offer, on their part, to do so in terms of their agreement, before or since the public sale, but urges the failure of the old company as an excuse for this precedent duty, to foreclosing on the road, and sets up their practical

waiver, namely: the issuing of these certificates for the work actually done, and prays to foreclose complainant's debt, either—

1st. On the entire road and its receipts; or,

2d. On that part which was built by Gray and others, under the mortgage of 2d August, 1842, and its net receipts; or,

3d. Upon the net receipts alone of the part so built by the contractors between Griffin and Atlanta.

So much for the case, as made by the bill. Has the complainant any equity which entitles him to the relief which he seeks?

[2.] It is admitted to be now an established rule of Chancery practice, that for the purpose of marshaling the assets of an insolvent debtor's estate, that the executor or administrator may file his bill and obtain a decree not only for the purpose of reducing the property to money, but also of ascertaining the order in which the debts are to be paid; and, that this done, all the creditors will be restrained from prosecuting their respective claims at Law; and that not only as to creditors who were *eo nomine* parties to the proceeding, but to all others. *Toller*, 455. *Brown and others vs. McDonald. Matter of the Bank of Buffalo*, 10 *Paige*, 378.

One of the grounds upon which this doctrine is based is, that the executor or administrator may not be harrassed by a multiplicity of suits, or a race of diligence be encouraged between different creditors, each striving for an undue mastery and preference. *Jeremy on Eq. Jur. b.* 3, *pt.* 2, *ch.* 5, *p.* 538 *to* 543.

Again: no other Court but that of Chancery possesses any adequate jurisdiction to reach or dispose of the entire merits. 1 *Story Eq. Jur.* §550.

[3.] As a general rule, Chancery does not assume jurisdiction in taking into its own hands executions upon judgments at Law. Such power would be oppressive both to the debtor and the Court.

[4.] For the presumption is, that the Court which renders the judgment is competent to enforce it; and therefore it is only in special cases that a Court of Equity interferes. *Brinkerhoff and others vs. Brown and others*, 4 *Johns. Ch. Rep.* 671. Whenever, however, the property of a judgment debtor is incumbered with

equities or trusts, or involves a variety of interests upon general principles of justice, a Court of Chancery will interpose and administer the assets. *Piatt vs. St. Clair*, 6 *Hammond*, 233.

[5.] The facts of the case under consideration were novel and peculiar. Here was a road extending through six Counties, and one hundred miles in length.

[6.] What disastrous consequences would have resulted, if each judgment creditor had been allowed to seize and sell separate portions of the road, at different sales, in the six different Counties through which it passed, and to different purchasers! Would not this valuable property have been utterly sacrificed— the rights and interests of the creditors, as well as the objects and intentions of the Legislature in granting this charter, entirely defeated?

[7.] I feel warranted in saying, that the whole history of Equity Jurisprudence does not present a case which made the interposition of its powers not only highly expedient, but so indispensably necessary in adjusting the rights of *creditors* to an *insolvent's estate*, as this did.

The Chancellor, then, in taking this matter in hand and directing a sale of the entire interest for the benefit of all concerned, was but invoking the powers of Equity to aid the defects of the Law, and applying analogous principles to the existing emergency; and so far from transcending his authority, he is entitled to the thanks of the parties and the country, for the correct and enlightened policy which he adopted. Had he faltered or shunned the responsibility thus cast upon him, he would have shown himself unworthy of the high office which he filled. As it is, this precedent will stand out in bold relief, as a landmark for future adjudications.

[8.] And what, I ask, is the ground of the present complaint? It is not an attempt to restrain a creditor from proceeding *at Law*, who, without fault on his part, has been excluded from participating in the common fund; but one claiming to be a creditor, but refusing to present his demand under the decree, and submit himself to the jurisdiction of the Court, for the settlement and adjustment of his debt upon the fund to be distributed,

comes forward and asks the assistance of Chancery to set aside its own decree, and annul the title to the property sold under it, in order that he may be paid.

[9.] It is true that the complainant alleges, in his bill, that he was not a party to the suit, and that he protested against it; but if justice has been done, is this any reason why he, on this account, should be treated with extraordinary favor and indulgence?

The bill admits, that "The officers of the Monroe Railroad and Banking Company believed that the contractors would not be materially injured by their proceeding, and that they were acting toward them in good faith; that the mortgage contract was a lien better and higher than all others, and that out of the proceeds of the sale, their lien would be first satisfied, for all labor bestowed and materials furnished under the contract of August, 1842; but that it had been decided by the Supreme Court, that the lien of the bill-holders over-rode said mortgage lien, as to all the road except that part above Griffin, which was not sufficient to satisfy all the mortgage contracts, or even those held by complainant."

Or, to use the more forcible language of counsel for the contractors, when this case was first before this Court, "It is obvious that the complainants in the original bill acted as far as they were able, and as far as they knew how, in good faith toward the contractors. Their object was to give the laborer his hire. Will any one do them the injustice—will any one so pervert the reading of the record—as to say that the object of the complainants in that bill was to sell the road and give the money to the bill-holders, and exclude the contractors from even a participation in the fund? Although, by so doing, they would relieve the stockholders of a heavy liability, we believe they acted in good faith, and that it does them gross injustice to suppose that they were using the Judiciary as an instrument to perpetrate a most iniquitous fraud. *Indeed, the decree speaks for itself.*" Col. Bailey's *Argument,* 1 *Kelly,* 446, 447.

If, then, as the bill admits, the proceeding under which this road was sold, not only originated in, but was conducted to its

conclusion in good faith to the contractors, and the decree was in conformity with the practice and usage in Equity, not pretending to fix or establish the payment or priority of any particular debt, but leaving this matter to be settled among and between the creditors themselves, upon coming in upon the fund under the decree, (*Ib.*) I am at a loss to perceive upon what principle this transaction, so just to Parker and beneficial to all concerned, is to be impugned, and the title to the property, acquired under it, vacated—none that will bear the test of legal investigation.

The bill charges, that it was supposed, that out of the proceeds of the sale, the contractors' lien would be first satisfied, but that the lien of the bill-holders was decided, by this Court, to over-ride the mortgage lien, except to that part of the road above Griffin, which was built by the contractors ; and that this portion of the fund was not sufficient to discharge all the mortgage contracts, or even the $47,500, held by the complainant.

Surely, this assignee does not come into *Equity* to get *more* than the laws of the land will award to him ?    Under this judicial sale, every dollar which that portion of the road brought, built by the contractors, to the extent of the work they performed and the materials they furnished, has gone into their pockets ; and because it fell short of extinguishing their demand, and the balance of the money arising from the sale of that part of the road constructed by the company previous to its insolvency, and to the contract of 1842, has been distributed to the bill-holders, by virtue of their statutory lien—is this a ground for cancelling Tyler's title ?

Mr. Parker complains that the property did not sell for its full value, but for much less, owing to the public notice that was given of these liens. If this vast interest, costing as it is charged, nearly $2,000,000, was thus sacrificed, who is to blame? It was not only the most advantageous, but the only possible mode of bringing it into market, to make it command a fair price.    Cut up into an indefinite number of small parts, it would have brought nothing, besides thwarting the whole design of the charter, by these fragments being bought by individuals or sepa-

rate companies. Instead of interfering, then, to counteract the praiseworthy object of the decree, why did he not aid in promoting it, and thus subserve, not only his own interest, but that of all the other creditors?

The bill admits, that the *whole* amount divided among *all* the contractors, was not enough to satisfy the complainant's debt. What a singular proposition then to maintain, that although the whole were only entitled, in Law, to a less sum than this individual claims, out of the entire proceeds, yet that this and every other creditor of the same grade, by standing out and standing off, and pursuing his remedy separately, would realize the sum total of his claim! And if such a procedure were permitted, when and where would these successive foreclosures and sales or *sequestrations* terminate?

There are other interesting aspects in which this question might be presented, but for our dread of being tedious. One view and a controlling one with the Court was this: it is conceded that if the sale had been made under the highest lien, that the title of the company would have been divested, and that the purchaser would have taken the property, discharged of all incumbrances. The record shows that such was the fact. The Central Bank and other bill-holders, and Robert Collins, one of the joint contractors, came in under the decree, and made their claim to the fund. If not parties to the suit before, they became so in fact by thus presenting their demands and submitting themselves to the jurisdiction of the Court. Here, then, were the two highest liens known to the law, upon the entire property—— that of the bill-holders, created by the Statute, on that part of the road built by the company, and that of the contractors, secured by the agreement of August, 1842, on that part of the road they built, and the materials they furnished. How, then, can creditors of equal or inferior grade disturb this transaction? If they have failed to participate in the fund thus raised, it is their own fault. Equity would restrain them from proceeding *at Law* to enforce their claims—much more will it refuse to sanction the effort now making.

Again: the bill admits that the agreement was not performed

on the part of the contractors, nor does it aver an offer to complete the contract, either before or after the sale.   If, under these circumstances, the contractors have received compensation as far as the fund would allow, for the work, labor, money and materials, done and expended by them in the construction of the road, can they, in conscience, seek to make the *road itself* liable for any thing more?   We think not; but we prefer to rest this decision upon the broad ground of a more comprehensive equity, and accordingly we hold that the judgment below be reversed, and the demurrer to the bill sustained, upon the ground that the complainant is not entitled to the relief which he seeks.